First case of the morning called 211-1183. People of the state of Illinois v. Detective Jay Anderson. On behalf of the Appalachians, Paul Rogers. On behalf of the people, Ms. Diane Timmons. Thank you. Mr. Rogers, you may proceed. Good morning. May it please the court. Good morning, counsel. Patrick Anderson was convicted following a jury trial of delivering three-tenths of a gram of heroin to an undercover police officer. I'm asking this court to find that Mr. Anderson was unfairly convicted and to grant him a new trial. There are two reasons for this. First, the conviction was based on evidence, namely the heroin, that never should have been admitted given the inadequacy and the insufficiency of the chain of custody for the heroin. And second, Mr. Anderson was the victim of his own attorney's incompetence. I want to jump right to the first issue concerning the chain of custody. And with respect to that, I don't really want to dwell on that issue, but I would like to call the court's attention to the first gap in the chain. And that gap concerns a period of time between when Agent Hsu, the undercover agent, got out of the undercover car, which was a Mazda, I believe, left the baggie with the alleged heroin on the dash. Was there evidence presented that the exhibit was compromised in any way? There was no evidence presented that it was compromised, but the question here is one of invisibility and the foundation for the proponent of the evidence to lay the foundation and the requirement that they show a sufficient chain of custody before it can be admitted. Right, but the state doesn't have to exclude every possibility of substitution or tampering. That's absolutely correct. They do, however, in a case such as this where you're talking about something that's not uniquely identified, something like a controlled substance, it's essentially fungible. It looks like anything else. Well, you consider all of the evidence, the way that the contraband was packaged and the officer identified it as the same, so this was not unique because, I mean, obviously it's heroin trafficking, but the packaging, there are different ways to package heroin. This just happened to be the same package or looked like the same package that the officer received, correct? Looked like the same package. One of the foundational requirements when you don't have a unique identifier is that the state show that they took reasonable protective measures of the item in question. And that's, of course, the obvious point here is to preserve the integrity of the item of physical evidence. After custody is gained. After custody is gained. And the officer was still undercover. Correct. Even after the transaction. He was arrested. He was. So one would expect he's not going to hang on to the contraband that he's being arrested for. It's going to be collected by one of the other officers, correct? And that's, that's right. And that's what happened. The problem is we don't know. There's absolutely no evidence. Who took that item out of the Mazda? How many people handled it in the interim? What they did with it before it was delivered by an unknown officer to Agent Hsu in the other car, which is like five or six car lengths away. And Agent Hsu admitted that he couldn't see what was going on at the Mazda. The only other officer who testified was, I think, Sergeant Mandernak. And he was there observing, but he didn't testify that he saw anybody in particular take it out of the Mazda. He just said that he went over to Officer Hsu at some point, and Officer Hsu gave him this baggie. And from that point on, I've argued in the brief that there are other problems with the chain of custody even after Mandernak got it. But today I'm focusing on that first gap, which is that 10 to 15 minute period when the custody of the item is completely clouded. But there's only, the evidence says that the only people on the scene is the defendant and the agents. That's right. So we've got 10 to 15 minutes where the only, the defendant's in custody, so he's not going to tamper with this. That's true. Tampering is not the only concern. Substitution. Accident. Contamination. Sure. It doesn't have to be a detention. We don't know. Right. So we don't know, did Officer X, whoever took it out of the, I'm assuming it's an officer. It's a fair assumption. Took it out of the Mazda. Did he drop it on the ground? Did it come open? Did he have to re-tie it? Did he open it up to see, hmm, I wonder what this could be? We don't know that. We don't know if he handed it off to somebody else. There could have been five, six people that handed this between the time it was in the Mazda and the time it got to Agent Hsu. But we do look at the facts, and we do look at the small, relatively small time frame where we have a baggie that's tied at the top. Not at the top. Not at the top. When the officer gets it, puts it on the dash, and then when he gets it back 10 to 15 minutes later, it's the same, he says it's the same baggie, and he says it's tied at the top, and he's able to feel the weight. I mean, he's able to see that it's not, you know, it wasn't a little baggie, now it's a brick. Right. You know? Right. No. That's correct. And I think the question really then comes down when you're talking about the first gap in the chain as to whether officers should simply say, yes, this appeared to be the same baggie that, you know, was handed to me in the Mazda. Is that enough? I made the argument, and I stand by it, that it's not enough given the other facts, namely that there were other people who were handing it in between, and he said it looked like the same baggie. Well, lots of things look like them. These cops look the same. I thought he said it was the same. Well, he said it was the same, but I think he also – Well, that's testimony to the record. Testimony to the record is this is the same baggie. That's his testimony. But his – that's a conclusion based on the way it appeared. His opportunity to observe it in the Mazda was not ideal because it was dark. He didn't handle it very long. He didn't open it to inspect its contents. There was this 10- to 15-minute period of time. I grant you it's true. He said on redirect, mind you, that, oh, yes, this is the same baggie. But, again, it's – well, is that – Well, I – to me that's the same thing. But, right, I think that's a fair way to express it also. In his opinion, you know, he said, yes, this is the same. So the question is, is that opinion sufficiently reliable to establish a prima facie case so that then the burden then shifts to the defendant to show some kind of affirmative tampering or contamination? But even if this – you know, again, of course, this is a judgment call for the trial court to make. It's a matter of the court's discretion. So even if this court disagrees about – disagrees with my argument about that judgment call, the chain of custody is still relevant. And here I want to shift to talking about the second issue, the ineffective assistance of counsel. It's – the bridge is this. With the chain of custody, we're talking about the admissibility of the evidence. And that's a low threshold, fairly, you know, relatively speaking, a lower threshold. Any deficiencies in the chain go to its weight. And the weight bears on the strength of the State's case overall. And that relates to the second issue, the ineffective assistance issue, when it comes down to assessing the prejudice that resulted from counsel's errors. And I've discussed, I think, possibly at too much length in the briefs, the nature of the errors that Mr. McMeekin made during the trial. There were three of them. And I would summarize them this way. Essentially, Mr. McMeekin portrayed, allowed the jury to hear, that his client was a drug-addicted habitual criminal who had an outstanding warrant for an unspecified offense, including a prior conviction for unlawfully possessing a controlled substance. We often hear, when we read transcripts or just in cases, references to attorneys dirtying up victims or other witnesses. Here, Mr. McMeekin dirtied up his own client. And he did so in the three ways that I've discussed. Can you see any strategy, strategic reason for doing that? I don't. And Mr. McMeekin had two main theories of defense. One, this is a weak chain of evidence. Therefore, you can't trust the lab result that this really was heroin. Two, and it's related, Mr. Anderson is the victim of a frame-up. The police arrived to get him. They set him up. They got him. A frame-up or an entrapment? Well, frame-ups suggest that the evidence is not legitimate or is false, whereas entrapment relates not necessarily to the validity of the hard evidence or direct evidence, but goes to who had the initial intent to commit the crime. So was it a frame-up or was it an entrapment or was it both? Well, it couldn't have been entrapment because that was never pled as an affirmative defense. And I pointed out, I think in the reply brief. Could this be an ineffective aspect of counsel's strategy? Yes. I think that's a good way of putting it. And I think I put in the opening brief of the reply brief that if you look at the record, I think Mr. McMeekin, I think it's a fair inference that Mr. McMeekin confused entrapment and frame-up because in his opening statement he started arguing essentially long lines of this was a set-up. They lured, I think he specifically used the term, they lured Mr. Anderson. They got him to do this and so forth. And the State's Attorney objected and said, wait a minute, this sounds like entrapment. And I believe they had a sidebar. And the judge said to Mr. McMeekin, did you plead entrapment as an affirmative defense? And he admitted, no, I didn't do that. But I think the jury could find that based on what they're going to hear. And the judge, I think, correctly said, if you didn't plead entrapment, you can't argue entrapment. And so then he had to essentially try to make, turn the entrapment defense into a frame-up defense, which is analytically distinct, as Your Honor pointed out. I don't know of any case authority that says that it's unethical or improper or a reversible error. For police officers not to execute a warrant on someone who they're attempting to arrest for a crime that's committed in their presence. That's absolutely right. And I think that's why when Mr. McMeekin tried to get into that line of argument, why didn't you serve the warrant, an objection was sustained, and who cares why they didn't serve the warrant. In fact, we don't even know that they didn't serve the warrant. There was no evidence. Mr. McMeekin implied evidence. Whether the glass is half empty or half full, if there's no authority to indicate that this is wrong, then there's also no authority to indicate that it's right. So how would McMeekin fall on one side or the other and you say that he's ineffective when we don't know whether or not it was or was not appropriate? Well, the question in determining whether it's ineffective is, first of all, whether it's reasonable strategy, and second, whether it's prejudicial. The frame of strategy, that's reasonable. What's ineffective, what's unreasonable, is to allow, in trying to establish a frame of argument, to portray your client as a drug addict who's got outstanding warrants and has got a prior conviction for possessing drugs. And I just ask Your Honor to do sort of a thought experiment. Well, the opposite of your argument is that it would be preferable, if your strategy is a frame-up, that your client appear to be crystal clean. Yes. Okay. And how often do the police go after people who are crystal clean? I don't know. But here, the evidence was they had from confidential informant information that suggested that Mr. Anderson would be willing to do this. They contacted him, they set it up, they had it controlled by, and this is what happened. But the point is, it's not whether the police, what their motives were or how often they go after it. It's, do you want the jury to know this? And that's, I was getting to the thought experiment. Suppose you had, you know. Which explains why not to plead entrapment, because if you plead entrapment, that all comes in. Right. So it's a Hobson's choice. Right. But he didn't, to argue the frame-up, I don't see how it advances the frame-up argument to tell the jury the things that I've mentioned. And like I said, imagine two juries. One knows these things. Mr. Anderson is an addict. He has an outstanding warrant. Oh, by the way, one of his, and he's a criminal. The police knew he had a criminal record. And one of the things he's been convicted of before is possessing controlled substances. And the other jury doesn't know those things. Which of those two juries is really more likely to find him guilty? Which, as a defense attorney, I don't think you want the jury to know that information if you want the jury to think, this is not somebody who, this is somebody who could have been set up. Which brings me to my next question, which is if both juries would have found him guilty, where's the prejudice involved? My irony is I don't think, I think the likelihood that the jury that didn't have the information would find him guilty is substantially less than the likelihood that the jury that had the information would find him guilty. That information tipped the scales in the state's favor and against the defense's favor. So there's a likelihood he would have walked if this stuff doesn't come in. There is a reasonable probability. On a hand-to-hand, where all the officers are around, hand-to-hand delivery, on-scene arrest, with a bunch of officers watching, the likelihood that he's going to walk. Well, only one officer actually could testify that the exchange took place. Well, but there was nobody else there. Well, that's right. I understand that. That's true. The likelihood that the jury would have believed that the evidence was tainted, that you couldn't trust the lab result, and that he was framed, goes up. It certainly doesn't go down. It goes up if you know these adverse facts about Mr. Anderson. Well, you know, when you have a tough case, you're a defense attorney, you have a tough case, you've got to make some strategic decisions. Yes. You've got a hand-to-hand, on-view arrest. And you're going to try and poke some holes in this thing. I mean, one of the ways this attorney seemed to do it, I mean, he clearly understood that entrapment was not a viable defense, and if he put that forward, probably would not have gotten an instruction on it, based upon the evidence that I read in the record. I don't think you get an instruction on entrapment here. So he's got to find a way. You shoot some holes here, you shoot some holes there. On the back end of this, what you're saying is he tried to say it was a frame-up. I try to say it's more like it's a set-up. Not a frame-up, a set-up. He did it. My client did the crime. But he did it because the police set him up, because it was an easy mark to get set up. And the reason he's an easy mark is because they knew he had this baggage. I mean, you can talk about it. You're saying that's totally unreasonable. I'm not saying that's an unreasonable strategy. I don't see how telling the jury those facts helped. To me, that is an unwise and unreasonable choice by the defense attorney to tell a jury, my client is a drug addict, my client has a criminal record. That criminal record includes a prior conviction for possessing controlled substances. Now, please find that he's not guilty. But, again, he's an easy mark. And if it was a nun that they walked in here and tried to say, well, this is a set-up because the police are always going after nuns. I mean, I'm just saying, it's an easy mark. It's basically saying the police knew he had this baggage, so let's hang another wrap on him. And that's why we didn't arrest him on the warrant in the first place. That's true. You have to keep in mind, though, that this is only one part. There's only half of the strategy here. The other strategy, as I mentioned, is this is a bad chain of custody here. Do not trust this lab result. Yes, maybe they did set him up because he was an easy mark. But you don't really need to tell the jury exactly why he was an easy mark. You can say, but you know what? Maybe the defendant was smart enough to try to rip off the person who he didn't know was an undercover agent by selling him something that wasn't heroin. And so don't trust this lab result. And I don't see how the things that I've mentioned advance that strategy at all. And I'd like to point out just in that connection, and I know that my time is running short here, but something that I didn't call attention to in the briefs, I don't think the state mentioned it either, but perhaps the court noticed this, that the jury had a question during deliberations about essentially what are the standards for securing evidence, and if it wasn't really heroin, could he still be charged? And I think that note from the jury, that question, suggests that they had some suspicion or some doubt about the integrity of the chain themselves, and that's part of what makes this prejudicial. So for those reasons, the bad chain of custody and the ineffective assistance of counsel, I would ask this court to reverse Mr. Anderson's conviction and to grant him a new trial. Thank you, Mr. Rogers. We'll have time for rebuttal argument. Ms. Campbell, you may proceed. Good morning, Your Honors. I'm going to address both issues that the defendant did since we were just recently talking about the attorney's assistance. I'll address that first, but I do want to get particularly to the chain of evidence question. One thing I want to point out, which I don't think I did very well in my brief, is that just prior to the trial starting, the state only crossed one of the counts, which was the possession count. I think this probably was rolling into defense counsel's strategy. The conviction that the defendant had that was admitted, and it was a possession of a controlled substance. It was not delivery, which is now the only drug charge against the defendant at trial. So those are two factors, I think, that perhaps went into defense counsel's strategy when he's going into. And you agree that defense counsel could have kept out, there's an outstanding warrant, the criminal history, he's an addict. Of course, the judge sustained the objection to that, so he certainly could have kept that out and could have sanitized the prior conviction. I don't know that all that could have been kept out. Part of it was part of my actual argument is that it was part of defense counsel's strategy to get that in, because that does make him a logical target for the narcotics unit to go. That's a different question, though, but I mean the question is he could have kept it out. He might have been able to keep out part of it. He could have sanitized it to a felony. But again, it still will impeach the defendant in the eyes of the jury that he has a prior conviction. In this case, showing that he had a drug conviction goes to making him a logical target for the narcotics. Quite frankly, I haven't seen anything, and I can't discern from the record, any other reasonable trial strategy his attorney could have come up with rather than the set-up or frame-up argument. As you noted, the defendant comes to the undercover narcotics agent's car. He gets in the car. He produces the baggie with the narcotics, sets it on the dashboard. How are you going to explain the defendant's coming to the undercover agent unless it's a narcotics transaction? I don't think they're going to believe they're there for a Bible study program. So how else would defendant's trial attorney explain his presence at the scene? Well, when we look at effective assistance or ineffective assistance, we examine the entire record, not just strategy regarding one particular aspect. And in this case, the strongest argument was the chain, the problem with the chain. Exactly. And that, I think, is why, a good part of the reason why he does not go with the entrapment defense. He goes with the entrapment, it's you made me do it, so you have to admit that you did it. So he is admitting that that, in fact, you know, I brought those drugs. And so that eliminates the entire first part of the defendant's argument if he goes with the entrapment. So he goes with the, I was, you know, it wasn't really me or, you know, they set me up or framed me. That's really his only possible defense. Maybe you're giving counsel a little bit more credit based on hindsight being 20-20. And how do you know there's a missing link in the chain before you get to trial? Exactly. You don't know. So, I mean, basically, he has a strategy where he doesn't raise entrapment. And he raises the setup situation without really knowing whether the chain is going to be good or bad. I think he has a couple insights into it. He would have read the police report. So, you know, he could have, well, he doesn't know which officers are going to come to testify about the bagging and the dashboard part. But he would have read. That's ordinarily something that would have been covered in a police report. Your typical police report is going to account for the chain. There is the possibility of, like, the nodded versus unnodded. That was a point that defense counsel brought out. That's a possibility. You know, quite frankly, the chain of evidence is going to be his best possibility for a weak link. He doesn't know, as you said, going in what's going to be proven up and what gaps. And certainly he tried his best to take advantage of every possible gap that he could try and point out. I think it was very effective in that way in trying to drive those wedges in. What about that missing link in the chain? Why doesn't that? I don't. Well, under Howard and Worrell and some of these cases that are cited by defense, why doesn't this get tossed? With all due respect for Your Honor who wrote Howard and Justice McLaren who was on the panel, I have to join some of your colleagues in Blankenship who were critical of that decision. I think it goes well beyond the standards that the Supreme Court set up in Woods. And let me just point out three things from Woods that I'd like to emphasize. That state bears the burden to establish a custody chain sufficiently complete to make it improbable that the evidence was subject to tampering or accidental substitution. That the police take reasonable protective measures to ensure that the evidence that was taken at the scene from the defendant is what's tested at the lab. And that the state is not required to reduce every person who handled the item or to exclude every possibility of tampering or accidental contamination. And that's at 467 in Woods. Is there a presumption that if everybody on the scene, other than the defendant is a police officer, that there will be no tampering or contamination because they're all police officers? Or are we supposed to speculate as to whether the glass is half empty or half full? I think you can take that as one of your circumstances. And certainly at this point, there's testimony that there's eight officers on the scene securing the scene. We know that it's a 10 to 15 minute period of time from when the defendant and Officer Hsu are taken out and arrested. And the time that the officer bags and seals the evidence.  We've got eight officers who are controlling that scene. Presumably they're not letting pedestrians wander by. It's not a situation where you've left an apartment open. It's not in a drug house where you can have multiple defendants who have access. You have one guy, one officer, one bag of evidence. And you've got Officer Hsu's testimony that this is the same bag that the defendant gave me, that I gave to Officer Hsu. Hsu didn't testify who gave him the bag, did he? Yes, he said this is the same bag I got from the defendant. What I said was, at least I thought I said, he did not identify the other officer who gave him. Correct. His testimony was that he could not remember and he had not noted in the report just that it was one of the other agents. He did not remember which other agent it was. When you say noted in the report, what was noted in the report? Officer Hsu's testimony was that he did not note in his report which officer gave him the, gave him back the. His only testimony was that the agent gave him the bag and it was the same one that he had received from the defendant. And obviously, a big part of this is also the trial judge's credibility determination. Because all this came out, it was argued, and the judge pointed out twice Officer Hsu's testimony that this is the same bag. So obviously, he gave great credibility to that statement and that was why. That is the point where the defendant, you know, if he has any evidence of tampering, needs to come forward with it. And there is no evidence of any kind that there was actual tampering that occurred with the, it's all defense counsel's argument. Defendant didn't get on the stand and testify that it wasn't heroin that I gave him. There's, just before trial, defense counsel is disputing with his client about trial strategy. He is advising the defendant to take the stand. Defendant is adamant that he does not want to take the stand. So that is in the record before trial. That's, you know, part of the, what's going on, you know. So it was within the defendant's capabilities to testify on his own behalf that the heroin wasn't heroin because what he presented to Officer Hsu was a lookalike facsimile? Yeah. It was solely his decision and it was against advice of his counsel that he chose not to testify. Unless you can point to the record that indicates that they actually were discussing this specific point, I think you're going out on a limb and suggesting that this is the reason why or this was considered by the parties and we should therefore assume the worst since he could not testify. He could have multiple reasons, you know, stage fright, you know, for not wanting to be. But certainly, you know, if you're looking at presenting a viable defense other than they framed me, you have to have a defendant who would be willing to get up, you know, for an entrapment and say, you know, this occurred. Or if he wanted to, chose to take the stand and deny that, you know, he gave it to him or that wasn't the bag that he gave to the officer or provide some other explanation for his being, you know, at 845 in the car with the undercover narcotics agent. You know, he might have had a better defense, but he was adamant that he was not taking the stand. What's your response to Mr. Rogers' claim that his client was prejudiced by officers? Again, I don't think that's so. I think his defense counsel was in a very hard situation. Otherwise, you should have called his doctor after four hours. So quite frankly, I don't see any other strategy his counsel could have employed that would have had a better shot. He certainly was very effective in trying to exploit any weaknesses in the chain of evidence. He tries to make it appear or argue that you should draw the inference that his client was set up by the officers because they fail. They think he's a drug dealer because of the failed prior transaction in October. And so now they want to get him and they've tried to set him up or frame him. As I said, I don't see a viable other defense. So he has done the best with a bad job. Do you have any other questions about any other aspects of the ineffective assistance or the chain of evidence? Thank you, Ms. Campbell. Mr. Rogers, you want to argue? First is to, you know, the defendant testifying. Obviously, he had the right not to testify, and we can't really draw any inferences from the fact that he didn't. We don't know what he would have said if he had chosen to testify. The relationship between the chain strategy and the set-up strategy, you know, deserves some more attention here. And it's true that before you get to trial, I think as a defense attorney, as a trial defense attorney, I would expect that, well, they're going to prove this chain. They're going to call Officer A, B, and C and say, I took it out of Mazda and I gave it to Hsu, and that's all you needed to do, really. It would have been very easy for the state to do this, and they didn't do it. Well, as Justice Burkett indicated, many times that is in the reports. And perhaps the only thing in the reports is that the name was missing, but it said an officer gave it to me. And then you would expect perhaps an officer to testify that I gave it to Hsu, and then the most you could do is impeach whoever wrote the report. Well, that's true, although I can't imagine that in this circumstance where you're talking about a task force, that there isn't a record of exactly who was in on this operation. And that the state could find out who was in on it, find out which one of you guys took this out of the Mazda. I need to know that. Please tell me, and I will call you as a witness so that you can tell me that you took it out and then you can tell me what you did with it. Well, believe me, it seems easy for them to have done that, but they didn't, and that's why we're here. Right, exactly. And the other thing is that, you know, as far as the setup strategy is concerned, that may be – that may have been a reasonable choice. I think it's somewhat of a gamble. And what makes it particularly a gamble is that then you do run into this problem of, well, I have to give – I have to tell the jury some reason why they would bother to set him up. Which means I'm going to have to – I have a choice then whether I tell the jury all these adverse facts about my client that do not make my client look like a law-abiding citizen. And then ask the jury to ignore that and say, but they set him up. Now, I think it would have been possible, and really not that difficult, to make the setup argument without bringing in all this adverse information about your own client. You could have said, look, they had information from a confidential informant. We don't know what the confidential informant had to say. They call this guy. He shows up. Yes, they tried to do it on October 28th. He didn't show up. Counsel, if I can hypothecate, the bottom line is you're claiming that the state hasn't established that this was heroin, correct? Well, that's one of the arguments. The other argument is that – Okay, let's take it to the next step. If it wasn't heroin, what was it? Who cares if the defendant presented it as such? If he were to attack the chain of custody and claim that it wasn't heroin, he would essentially be admitting that he was attempting to rip off the police officers with a facsimile drug, which meant that he would essentially be admitting that he was committing a crime, which meant that he was also admitting that he was attempting to rip them off by taking possession of ammunition and a firearm, correct? Well – So in any event, the problem with taking your argument to the logical conclusion is that the defendant is going to have to admit to at least one crime that he's been charged with and other crimes that he hasn't been charged with. So in closing argument, what he basically says is you can find him guilty of the attempt possession, unless of course you don't believe the police officers that this ever happened, and you shouldn't find him guilty of delivery because he really should have been charged with attempted delivery of a facsimile drug. Now, is that not the logical argument that should have been made if in fact the chain of custody was in doubt? I think that would have been a good argument to make. I don't know that that's the only argument to make. I don't even know that you need to lead the jury quite that far, that you need to spell out all those implications for the jury. What you need to get an acquittal is to have the jury doubt whether the charges have been proved by the state. And the charge was delivery of heroin. Well, as between your client saying what I just suggested, if you were to have taken a stand, and the testimony from the officer relative to the adequacy of the chain, do you think the jury would have bought the story that your client made as opposed to the testimony of the police officer such that there would have been a different result and you would have established prejudice? Well, I... You don't have to... I'm not asking for you to admit... Well, I want to make sure that I'm understanding your question, because I'm not sure that I do. You're saying that... I'm saying if you look at this, for want of a better term, logically, and you look at how it's presented, it really boils down to the jury is going to have to decide whether it believes the defendant who didn't testify about the fact that he gave them something that wasn't heroin, saying that it was, and the police officer who say that it was heroin based upon testing and based upon the fact that, except for a short period of time, it wasn't... its whereabouts were unknown. I think the answer to that question is it's not a question of the jury believing the state's witnesses or what they would imagine the defendant would have had to say. It's a question of getting the jury to say, can you trust what the police had to say, and when I say police, including the lab technician who analyzed it, can you trust all of this to believe that my client is guilty of delivering actual heroin? And the reason why the ineffective assistance was so prejudicial is because the mistakes that I pointed out just made it more likely, in my view, that a jury would say, oh yeah, this guy delivered heroin. It is accurate that there was a record made that your client did not want... defendant did not want to testify. That is true, although that occurred before the trial started. It was never revisited, so I assume he stuck with that. He never said, I changed my mind, I want to testify. All of these defenses that we've been talking about here largely hinge on a defendant taking a stand and testifying to support the inferences that you're going to ask the jury to draw in closing argument, correct? I guess we quibble over what hinge means, but I would say... Largely. ...would be enhanced, would be improved by, but you can't force your client to testify, so as a defense jury you have to do the best you can. Thank you. One other point, correct me if I'm wrong. Your client's presumed innocent prior to conviction, and therefore trial counsel could have made the arguments relative to the favorable inferences, despite the fact that your client didn't testify. But now that he's been convicted and we're supposed to use the burden on review, you're in a more difficult position than trial counsel would have been for purposes of claiming that the inferences should be taken in your client's favor. Well, keep in mind I'm not asking this court to reverse the conviction outright. You're assessing the prejudice from the ineffective assistance, and under Strickland the standard of prejudice is a reasonable probability, whatever that means, that the result would have been different, and to answer my own sort of implied question there about what reasonable probability means, Strickland also says, well, it means something that unbinds confidence in the result. My point was in reference to him getting on the stand and testifying that this isn't heroin, which would then tend to impeach or present controverted evidence that there was a proper chain of custody, which then would go to the admissibility of the heroin, which would then possibly alter the outcome if the trial court were to suppress the contraband, so that in that sense the failure to testify that it was not heroin is more easily made at the trial court prior to conviction as opposed to here, which is after conviction. Well, sure, because we can't present any evidence now. Right, I agree with that. Okay. I'd like to thank both the attorneys for their argument. The case will be taken under revisal. We'll take a short recess.